## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Applicant for Intervention,<br><br>        v.<br><br>TOWN SPORTS INTERNATIONAL, INC. and<br>TSI WELLESLEY, INC.,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)   No. 05-cv–10611-GAO<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION TO INTERVENE AS OF RIGHT OR, ALTERNATIVELY, TO INTERVENE BY PERMISSION

### Introduction

The United States files this Memorandum of Points and Authorities in Support of its

Motion to Intervene in this action for injunctive and declaratory relief and compensatory

damages to remedy alleged violations of title III of the Americans with Disabilities Act ("title III"

or "ADA"), 42 U.S.C. §§ 12181, et seq. The action stems from the alleged discrimination by the

defendants, Town Sports International, Inc. ("TSI") and TSI Wellesley, Inc., against a child

(E.M.) with type I diabetes mellitus. TSI removed her from their summer camp after initially

accepting her as a camper. TSI also denied her parents' reasonable request that camp staff watch

E.M. as she used her glucose monitoring gauge and as she entered on the electronic keypad of her

insulin pump the number of carbohydrates identified by her parents for the food that she brought

from home to consume at snack and lunch times. These tasks, which were estimated to take less

than thirty minutes per day, were necessary for the management of E.M.'s diabetes.

The United States requests leave to intervene of right, or, alternatively, to intervene by permission, pursuant to Rule 24 of the Federal Rules of Civil Procedure. Intervention of right is warranted in this case because the United States has a significant protectable interest in the enforcement of title III of the ADA, which is not adequately represented by the existing parties and which may as a practical matter be impaired if intervention is denied. See Fed. R. Civ. P. 24(a)(2). Alternatively, the United States moves for permissive intervention because its claims against the defendants have questions of law and fact in common with the main action, and the main action involves the interpretation of statutes which the Attorney General is entrusted by Congress to administer. See Fed. R. Civ. P. 24(b)(2).

### A. **Statutory and Regulatory Background**

Title III of the ADA prohibits discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, . . . or operates a place of public accommodation." 42 U.S.C. § 12182(a). The definition of "public accommodation" includes a facility operated by a private entity whose operations affect commerce and falls within at least one of the following categories – "an elementary school . . . or other place of education"; "a day care center or other service center establishment"; or, "a place of exercise or recreation." 42 U.S.C. §§ 12181(7)(J), (K) and (L); 28 C.F.R. § 36.104. TSI Wellesley Camp could be included within any of these title III definitions for covered entities.

The Justice Department is responsible for enforcing title III of the ADA. 42 U.S.C. § 12188. Under the ADA, the Justice Department has the authority to investigate alleged

violations of the ADA and commence a civil action where reasonable cause is found to believe that any person has been discriminated against on the basis of disability. 42 U.S.C. §§ 12188(b)(1)(A)(I), 12188(b)(1)(B)(ii).

Title III of the ADA and its implementing regulations include additional nondiscrimination provisions that prohibit discrimination in the denial of the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation to a person with a disability. 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. § 36.202(b). ADA title III regulations require a reasonable modification in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability unless the private entity can demonstrate that making the modification would fundamentally alter the nature of the service, program, or activity. 42 U.S.C. §12182(b)(2)(A)(ii); 28 C.F.R. § 36.302(a).

## B. Factual Background

On March 29, 2005, plaintiff E.M. instituted this suit against the defendants for violations of title III of the ADA through discrimination in the provision of services, programs, and activities at the defendants' summer camp program. Plaintiff E.M. is a person with a disability under the ADA, and, more specifically, she is substantially limited in one or more major life activities, including her ability to eat and metabolize food and to care for herself. As alleged in the plaintiff's complaint, the United States argues, based upon information and belief, that the defendant unlawfully removed plaintiff E.M. from its summer camp program because of her type I diabetes mellitus. In addition, TSI refused to reasonably modify its policies, practices, or procedures when the camp denied E.M.'s parents' reasonable request for assistance from camp

staff in overseeing E.M.'s use of her glucose monitoring gauge and her inputting of codes into her insulin pump, which is necessary for the management of her diabetes.

The United States Department of Justice obtained a copy of plaintiff's complaint on April 5, 2005, and has reviewed facts and information related to this case. Pursuant to 42 U.S.C. § 12188(b)(1)(B)(ii), the Attorney General has certified that this case raises an issue of general public importance. The United States seeks to intervene in lieu of filing a separate lawsuit in order to preserve limited judicial resources, the time and resources of the parties, and those of the Department of Justice.

The Proposed Complaint in Intervention, attached hereto, alleges discrimination in the defendants' summer camp program in violation of title III of the ADA. Through intervention, the United States seeks to ensure that the defendants' summer program is accessible to the named plaintiff and individuals with diabetes who could participate in or benefit from the camp program.

### Argument

Rule 24 of the Federal Rules of Civil Procedure controls procedures for both permissive intervention and intervention as of right. Subsection (a) defines the limits for intervention as of right while subsection (b) provides the framework for the Court's exercise of its discretion to approve permissive intervention.

- 4 -

## I.    The United States Is Entitled to Intervention as of Right.

The First Circuit has identified the four elements necessary for intervention as of right:

> [1]   upon timely application anyone shall be permitted to intervene in an action: [2] when the applicant claims an interest relating to the property or transaction which is the subject of the action and [3] the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, [4] unless the applicant's interest is adequately represented by existing parties.

Daggett v. Comm. on Governmental Ethics and Election Practices, 172 F.3d 104, 109 (1st Cir. 1999), citing Fed. R. Civ. P. 24(a)(2). An applicant for intervention as of right must satisfy each of the four elements laid out in Daggett.

### (A)    The United States' application for intervention is timely.

The determination of timeliness is within the sound discretion of the trial judge and is not designed to penalize potential intervenors but to protect the rights of the existing parties and to prevent unfairness by tardy intervention by prospective intervenors. Garrity v. Gallen, 697 F.2d 452, 455 (1st Cir. 1983). One test often used to evaluate timeliness in the First Circuit includes three factors: (1) how far the proceedings have gone when the movant seeks to intervene; (2) prejudice to the existing parties caused by the applicant's delay in moving to intervene; and, (3) the reason for the delay. Culbreath v. Dukakis, 630 F.2d 15, 19 (1st Cir. 1980).

In this case, it is beyond peradventure that the United States has met the standards for timeliness. The plaintiff filed this suit on March 29, 2005, and the Department received a copy of the complaint on April 5, 2005. The United States learned about the plaintiff's complaint, and drafted a proposed complaint in intervention, which pursuant to Department of Justice policy had to be approved by Department officials before filing. Upon consultation with the parties prior to

filing suit, they requested that the United States participate in settlement negotiations and delay filing the complaint in intervention. The United States agreed to negotiations, which have now been successfully completed, and the proposed Consent Order is being filed simultaneously with the motion to intervene and proposed complaint. Permitting the United States to intervene at this very early stage would not prejudice the parties because time to answer has been postponed. Settlement negotiations have concluded; the parties have not begun discovery; and, finally, no dispositive motions have been filed.

By contrast, the United States would suffer serious prejudice if not permitted to intervene in this lawsuit. First, the United States would be deprived of an opportunity to participate in the first lawsuit and Consent Order to be filed on the specific issue of discrimination by a summer camp on the basis of disability involving a child with diabetes. By definition, a decision here could be precedential and a substantial impact on enforcement of the ADA, a statute for which the Attorney General has been given enforcement authority. 42 U.S.C. § 12188(b). This is the first federal court case on this issue in the First Circuit and one of only a handful of cases about children with disabilities in any court. The United States' participation in the litigation of the important issues in this case and in sharing the development of the law and facts could help determine the outcome and thus the enforceability of the ADA in similar cases around the country.

> (B)    The United States has an interest relating to the property or transaction which is the subject of the action.

As the federal agency charged with enforcing the ADA, the Department has a substantial interest in the subject matter of the pending litigation. Underlying enactment of the ADA was

- 6 -

Congress' intent to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(1). Congress sought "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(2), and explicitly stated that one of the purposes of the ADA was "to ensure that the Federal Government plays a central role in enforcing the standards established [in the Act] on behalf of individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(3). The United States' prominent enforcement role is reflected in the statutory authorization given the Attorney General to commence a legal action when discrimination prohibited by the ADA takes place. 42 U.S.C. § 12188.

The United States has an interest in the transactions involved in this case, and a unique responsibility to ensure that the Court is presented with an adequate record to assist in the development of clear, consistent, enforceable standards for ADA enforcement. See Ceres Gulf v. Cooper, 957 F.2d 1199, 1204 (5th Cir. 1992) (collecting cases, and finding, in insurer's suit against employee for reimbursement of advance payments, that the interest of the federal director of the Office of Workers' Compensation Programs in "consistent application of . . . a statutory scheme he is charged with administering" was sufficient to support intervention as of right); Nuesse v. Camp, 385 F.2d 694, 700-01 (D.C. Cir. 1967) (discussing liberalization of Rule 24(a) under 1966 amendment, and finding that state government official charged with administering a banking law had interest in advocating particular construction of the law that was sufficient to support intervention of right).

> (C)    Disposition of this action may as a practical matter impair or impede the United States' ability to protect its interests.

Because the ADA is a relatively young statute, federal decisions interpreting and applying the provisions of the Act are an important enforcement tool. An unfavorable disposition of this case may, as a practical matter, impair the United States' interest in eliminating disability discrimination. Moreover, the First Circuit has not yet addressed the application of title III to discrimination against children with disabilities and public accommodations limiting their participation in programs, services or activities. Thus, the outcome of this case implicates *stare decisis* concerns which support intervention of right by the United States. See Michigan State AFL-CIO v. Miller, 103 F.3d 1240, 1247 (6th Cir. 1997)(finding impairment factor implicated in First Amendment case where the applicant, the Michigan Chamber of Commerce, asserted that "the precedential effect of an adverse ruling in the district court could hinder its own efforts to litigate the validity of Michigan's system for regulating campaign finance both in currently ongoing cases and in future challenges"). See also United States v. City of Los Angeles, 288 F.3d 391, 400 (9th Cir. 2002) (holding that amicus status may be insufficient to protect the rights of an applicant for intervention "because such status does not allow [the applicant] to raise issues or arguments formally and gives it no right of appeal").

That the United States has substantial interests at issue in these proceedings is beyond question. First, as the agency with primary regulatory and enforcement authority under Title III of the ADA, the Department of Justice plainly has not only an interest in the outcome of this particular litigation, but also a broader interest as well in ensuring the proper and consistent application of its own ADA regulations.

The Justice Department has unique experience and familiarity with the statutes and regulations at issue. Resolving the concerns of the private parties at the same time that the Court

considers the interests of the United States would also promote the development of clear,

consistent, enforceable standards that were contemplated by Congress. The outcome of this case

could have a direct impact on ADA enforcement by the Department and influence ADA policy

making for the future.  Should the Court decide the case without considering the concerns raised

by the Department, that enforcement and policy development will necessarily be impaired or

impeded.

 Finally, the alternative to the United States' intervention in the plaintiff's lawsuit is a

separate action to enforce the United States' title III claim, which would be an inefficient use of

the resources of both parties and the Court.

   (D) <u>The existing parties to the litigation will not adequately represent the
United States' enforcement interest.</u>

 The First Circuit has repeatedly held that the determination of whether the existing parties

will provide "adequate representation" is within the discretion of the trial court and subject to

review under the "abuse of discretion standard." <u>Public Serv. Co. of N.H. v. Patch</u>, 136 F.3d

197, 204 (1st Cir. 1998), quoting <u>Int'l Paper Co. v. Town of Jay</u>, 887 F.2d 338, 344 (1st Cir.

1989);  <u>Daggett</u> 172 F.3d at 110.   In addition, the First Circuit has historically permitted

representation in court by a government regulatory agency with responsibility to enforce the law

involved in the pending case. <u>Id.</u> at 111.

 The United States' significant interests, moreover, cannot be adequately represented by

the private plaintiffs in this action.    Only the Attorney General has the duty to represent the

public interest, and to seek enforcement in federal court when he finds that "discrimination raises

an issue of general public importance." 42 U.S.C. § 12188(b)(1)(B).  Unlike private parties, who

also have a cause of action granted under title III of the ADA, the Attorney General has a broader

interest in putting before the Court a case on behalf of all persons who might be affected by the

outcome of the case. The United States has a statutory duty to represent the interests of those

persons as well as those of the parties actually before the Court. The Department also has an

interest, on behalf of the public, in a clear and consistent interpretation and application of

relevant title III provisions while the parties have a more personal interest in the outcome of their

dispute. The Department brings to this action the Civil Rights Division's unique familiarity with

the statutes at issue; and extensive experience in investigating and litigating disability

discrimination complaints. Allowing the United States to share its experience and expertise

would advance the United States' interests on behalf of the public and could promote an efficient

resolution of this matter.

## II.    In the Alternative, the United States Should Be Granted Permissive Intervention if Intervention of Right is Not Granted Here.

Assuming, *arguendo*, the Court were not to grant the United States intervention as of

right in this case, the Court should grant the United States permissive intervention. The Court

may, in its discretion, grant permissive intervention "when an applicant's claim or defense and

the main action have a question of law or fact in common." Fed. R. Civ. P., Rule 24(b)(2). "The

district court can consider almost any factor rationally relevant but enjoys very broad discretion

in granting or denying the motion [for permissive intervention]." Daggett, 172 F.3d at 113,

citing U.S. P.S. v. Brennan, 579 F.2d 188, 191-192 (2d Cir. 1978). The general rule is that

permissive intervention under Rule 24(b)(2) ordinarily must be supported by independent

jurisdictional grounds. Int'l Paper v. Town of Jay, Maine, 887 F.2d 338, 346 (1st Cir. 1989)

- 10 -

(citations omitted).  As discussed above, the Court has jurisdiction over the United States'

claims.  For government agencies seeking to intervene to enforce the law, permissive

intervention is typically granted.  Id. (Rule 24(b) was amended to "break down barriers to

government intervention" where the Court otherwise has jurisdiction to review the complaint.)

Rule 24(b) of the Federal Rules of Civil Procedure states that a government agency may

intervene in an action involving a statute administered by that agency:

> When a party to an action relies for ground of claim or defense upon any statute or
> executive order administered by a federal or state governmental officer or agency
> or upon any regulation, order, requirement, or agreement issued or made pursuant
> to the statute or executive order, the officer or agency upon timely application
> may be permitted to intervene in the action.

Fed. R. Civ. P. 24(b).  See Securities and Exch. Comm'n v. United States Realty & Improvement

Co., 310 U.S. 434, 460 (1940) (allowing SEC to intervene due to its interest in maintaining its

statutory authority and performing its public duties; decided before 1946 amendment which

added above quoted language to Rule 24); see also Fed. R. Civ. P. 24 note to subdivision (b),

1946 amendment (explaining the purpose for the additional language allowing government

intervention).

As with intervention as of right, timeliness is a factor in permissive intervention.  Rule

24(b) states: "In exercising its discretion the court shall consider whether the intervention will

unduly delay or prejudice the adjudication of the rights of the original parties."  Fed R. Civ. P.

24(b).   By moving to intervene so quickly after the complaint was filed, the United States is well

within reasonable time frames for permissive intervention.  Daggett, 172 F.3d at 109

(requirement of timeliness was "easily met" when applicant moved to intervene weeks after suit

was filed);  In re Acushnet River & New Bedford Harbor, 712 F. Supp. at 1023 (application to

- 11 -

intervene over three years after filing of suit was "timely"). The United States has met even the most rigorous timeliness standards for either permissive intervention or for intervention as of right.

The United States' claims share common questions of law and fact with those in the pending litigation. The common question of law is whether the defendant's refusal to modify its policies to permit a camper with diabetes to attend TSI Wellesley Camp violates title III of the ADA, and the implementing regulations. The factual basis for the two complaints are the same. And, as discussed above, the United States' participation as intervenor would neither unduly delay the proceedings nor prejudice the adjudication of the rights of the original parties.

## CONCLUSION

The Department's intervention is in furtherance of its statutory authority and public duty, pursuant to its charge of implementing and enforcing the ADA. Furthermore, the Court's approval of intervention by the United States in this case would preserve judicial resources. In sum, the Court should grant the Department's timely motion to intervene in this matter on the basis of similar facts and law, because it will not delay the resolution of the case and does not prejudice the interests of the other parties, and because it involves the interpretation of the ADA, a statute which the Attorney General is entrusted by Congress to administer.

- 12 -

Respectfully submitted,

ALBERTO R. GONZALES
Attorney General of the United States

MICHAEL J. SULLIVAN
United States Attorney

WAN J. KIM
Assistant Attorney General
Civil Rights Division

BARBARA HEALY SMITH
Assistant United States Attorney
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3260
barbara.h.smith@usdoj.gov

JOHN L. WODATCH, Chief
PHILIP L. BREEN, Special Legal Counsel
RENEE M. WOHLENHAUS, Deputy Chief
Disability Rights Section
Civil Rights Division

ROBERT J. MATHER
Senior Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice - NYA
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 307-2236
robert.mather@usdoj.gov

March 16, 2006

Attachment (Proposed Complaint in Intervention)

- 13 -

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF).

                           /s/ Barbara Healy Smith
                        Barbara Healy Smith
                        Assistant United States Attorney

Date: 20 March 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | No. 05-cv-10611-GAO |
| | ) | |
| TOWN SPORTS INTERNATIONAL, INC. and | ) | [Proposed] COMPLAINT IN |
| | ) | INTERVENTION |
| TSI WELLESLEY, INC., | ) | |
| Defendants. | ) | |

The United States of America alleges upon information and belief:

1. This action is brought by the United States to enforce the provisions of title III of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12181, et seq., against defendants Town Sports International, Inc., and TSI Wellesley, Inc. (collectively, "Defendants" or "TSI").

### JURISDICTION AND VENUE

2. This case arises under title III of the ADA, 42 U.S.C. §§ 12181-12189. The Court has jurisdiction of this action under 29 U.S.C. §§ 1331, 1345, and 42 U.S.C. § 12188(b). The Court may grant declaratory and other relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. All the claims and events giving rise to this action arose within this judicial district.

## PARTIES

4.    Plaintiff-intervenor is the United States of America.  The Attorney General has been

authorized by Congress to initiate legal proceedings on behalf of the United States to

enforce title III of the ADA in matters involving public accommodations like TSI through

litigation in any appropriate United States district court.  42 U.S.C. § 12188(b)(1)(B).

5.    Defendant Town Sports International, Inc. (TSI) is a corporation with its principal place

of business at 888 Seventh Avenue, New York, NY.  It is a leading owner and operator of

more than 130 health and fitness clubs and recreational programs for adults and children

in several major cities, including many locations in or near Boston, Massachusetts.   TSI

owns, leases, and/or operates health and fitness clubs and recreational programs for adults

and children, including TSI Wellesley Camp, which are "places of education," "day care

centers or other social service establishments," or "places of exercise or recreation," as

defined by section 301(7) of the ADA,  42 U.S.C. § 12181(7), and by the Department of

Justice regulations, 28 C.F.R. §§ 36.102, 36.104.

6.    Defendant TSI Wellesley, Inc., is a subsidiary of TSI.  It is a corporation with its principal

place of business at 140 Great Plain Avenue, Wellesley, Massachusetts.  TSI Wellesley,

Inc., owns, leases, and/or operates health and fitness clubs and recreational programs for

adults and children, including TSI Wellesley Camp, which are "places of education,"

"day care centers or other social service establishments," or "places of exercise or

recreation," as defined by section 301(7) of the ADA,  42 U.S.C. § 12181(7), and by the

Department of Justice regulations, 28 C.F.R. §§ 36.102, 36.104.

## FACTUAL ALLEGATIONS

7.   Plaintiff, E.M., is a seven-year-old with type I diabetes mellitus who resides in the State
of Massachusetts with her parents and her sister, H.M.   Because of her diabetes, E.M. is
substantially limited in the major life activities of eating and caring for herself, or in the
alternative, Defendants regarded her as substantially limited in one or more of those
activities, and she is therefore a person with a disability as defined by the ADA and
implementing regulations.  42 U.S.C. §12102; 28 C.F.R. § 36.104.

8.   E.M. has type I diabetes mellitus, a disorder of the endocrine system that results in
insufficient production of insulin, an enzyme necessary to metabolize glucose.
Insufficient insulin causes a buildup of blood sugar and, if not continuously monitored
and adequately treated, can cause permanent damage to the kidneys, hearing, eyes, and
nervous system.   Going without insulin for several days could lead to serious
complications, including death.

9.   E.M.'s diabetes requires constant delivery of insulin by means of an insulin pump
attached to her body that automatically injects insulin into her bloodstream.  The insulin
pump consists of a pump reservoir filled with insulin, a small battery-operated pump, and
a computer chip that allows her to control exactly how much insulin the pump delivers at
all times, twenty-four hours a day, seven days a week.  The pump reservoir delivers
insulin to the body by a thin plastic tube with a needle or soft cannula at the end through
which the insulin passes.  The pump can be programmed to deliver higher does of insulin
when needed to counteract high blood sugar levels and increased carbohydrate
consumption.

10.    E.M.'s diabetes requires frequent monitoring. This monitoring involves pricking her finger to extract a tiny drop of blood that E.M. immediately applies to a small paper test strip that she places in the glucose monitoring gauge to read her blood glucose level. She must test after meals and periodically throughout the day to measure her blood sugar level. A high or low blood sugar is corrected by adjusting the amount of insulin delivered by her pump. Alternatively, a low level may also be corrected by providing a high-carbohydrate snack. On occasion, E.M. uses a paper strip that is color coded to test her urine for the presence of ketones to determine whether her body is failing to metabolize glucose and is breaking down fats in her body to provide energy.

11.    E.M. is skilled at testing her own blood sugar levels without direct assistance, but her parents requested that Defendants monitor E.M. in her self-testing for blood glucose levels during the days at camp. E.M. is also able to use her insulin pump without direct assistance. She knows how to input the numbers of carbohydrates in the food she consumes using the electronic keypad on her insulin pump, which then regulates her insulin. The numbers of carbohydrates in her food are routinely provided for her by her parents along with the lunch and snacks that she brings from home.

12.    In order to control her diabetes, E.M. must eat at regularly scheduled times and cannot skip meals. In addition to three meals a day, she must eat snacks twice a day between meals and must monitor her carbohydrate intake to maintain a blood sugar level that is as consistent as possible. Medical research shows that patients who maintain a consistent blood sugar level are at less risk for complications and serious health problems associated with diabetes. Complications from uncontrolled diabetes can include digestive and

4

circulatory problems, interruptions in sleep, lethargy, unconsciousness, and eventually

blindness, hearing loss, and death.

13.    E.M.'s diabetes has been successfully managed with monitoring by staff at her school,

preschool, and after-school placements and by staff at other recreational programs she has

attended.  E.M.'s mother, a physician, has trained E.M.'s other care providers in assisting

with monitoring E.M.'s diabetes.  E.M.'s parents provide all meals and snacks that she

consumes when she is not at home, together with information identifying the number of

carbohydrates in each item of food to assist in adjusting the amount of insulin

administered by the pump.

14.    E.M. is an individual with a disability within the meaning of the ADA, based upon her

type I diabetes mellitus, a disorder of the endocrine system that substantially limits, or

which defendants regard as limiting, one or more major life activities, including her

ability to eat and to care for herself.   42 U.S.C.

    § 12102(2); 28 C.F.R. § 36.104.

15.    On or about February 9, 2004, E.M.'s parents enrolled E.M. and her older sister H.M. at

TSI Wellesley Camp ("Camp") on Mondays, Wednesdays, and Fridays during the

summer of 2004.

16.    In late May 2004, Dr. Thompson sent the Camp completed medical forms for each child.

E.M.'s form included information about her diabetes and detailed information about how

to monitor E.M.'s condition related to her diabetes.

17.    Dr. Thompson contacted the Camp repeatedly in an attempt to set up a meeting to teach

staff about managing E.M.'s diabetes before the camp season began in June 2004.  She

was told to call a person named Kara. When Dr. Thompson received no reply to her messages to Kara, she went to the Camp and left a note on Kara's desk requesting that she contact them to arrange a time to meet.

18.   Finally, still having received no reply to her messages, Dr. Thompson and E.M. went to "Meet the Counselor" day at the camp on or about June 6, 2004. At the meeting, Dr. Thompson explained the simple tasks necessary for the counselors to monitor E.M.'s self-testing, glucose monitoring, insulin pump, and conditions related to her diabetes. One of the counselors, Emily Berry, expressed interest and volunteered to be the counselor assigned to E.M. during the summer. Dr. Thompson taught Emily how to measure E.M.'s blood glucose level, the significance of high and low blood sugar levels, and how to operate the electronic keypad to input numbers into the insulin pump of carbohydrates identified on the food items that E.M. brought from home. At the end of the meeting, Dr. Thompson stated that she wanted to train another person as a backup and also review the procedures with Emily one more time.

19.   On or about June 15, 2004, E.M.'s mother met with the camp's health care employee, and Megan Carmichael, the head counselor, and another counselor who has type II (adult-onset) diabetes and who also volunteered to help look after E.M. Her mother taught them what they needed to know to look after E.M. and provided them with written instructions regarding protocols to follow in managing high, low, and normal blood sugar levels.

20.   On or about Tuesday, June 22, 2004, E.M.'s mother met with Peter Sylvester, who is the camp program director, Emily Berry, Rachel Tierney, another unidentified counselor, and Megan Carmichael. Emily and Rachel told E.M.'s mother that they would be looking

6

after E.M. and monitoring her use of the insulin pump. The procedures for managing

E.M.'s diabetes were reviewed once again. At the end of the meeting, Megan thanked

E.M.'s mother and stated that she felt comfortable, having heard the instructions twice.

21.     E.M. and H.M. attended the first day of camp on Wednesday, June 23, 2004. When

E.M.'s father, Quint Medley, came to pick up the girls in the evening, the camp director,

Peter Sylvester, asked Dr. Medley to meet with him. Mr. Sylvester told Dr. Medley that

they did not think E.M. should continue at TSI as a camper because she distracted the

counselors from the other children. He also stated that the Wellesley health inspector told

them that it was not legal for E.M. to be there. Mr. Sylvester denied that they intended to

discharge E.M. from the camp but wanted to have further discussion with the parents. It

was agreed that E.M.'s parents would come to camp the following day to discuss the

situation.

22.     After leaving the meeting, E.M.'s father met with Emily Berry and asked her if everything

had gone well that day in monitoring E.M.'s blood glucose levels. Ms. Berry stated that

everything was fine.

23.     On or about Thursday, June 24, 2004, Dr. Thompson met with Bill Patche, the TSI

general manager, and the regional director from TSI's Philadelphia office. At the

meeting, various options were discussed for E.M.'s participation at the camp. At the end

of the meeting, Mr. Patche stated that he would call the family later in the day about TSI's

decision.

24.     Later that afternoon, Mr. Patche spoke with E.M.'s mother and stated that he had

discussed the situation with the counselors and their medical consultant and that the

medical consultant wanted to discuss questions about E.M.'s diabetes care and treatment with E.M.'s doctor. He stated that E.M. would probably be able to return to camp the following Monday. E.M.'s mother gave Mr. Patche the telephone numbers of E.M.'s physicians.

25.   On or about Saturday, June 26, 2004, Mr. Patche called to say that he had not gotten in touch with E.M.'s physicians and therefore she could not attend camp on Monday.

26.   On or about Monday, June 28, 2004, E.M.'s parents spoke with Mr. Patche after dropping H.M. off at the camp for the day. They offered to obtain any information that the camp wanted from E.M.'s doctor. Mr. Patche gave them a list of questions that he wanted answered and stated that if they provided that information, E.M. would be able to attend camp on Wednesday.

27.   On or about Tuesday, June 29, 2004, E.M.'s mother met with Debra Holtorf, E.M.'s nurse practitioner at the Joslin Diabetes Center, to review and discuss proposed answers to the questions from the camp staff. Ms. Holtorf reviewed and approved the answers and signed and dated the document. In order to provide the camp with as much information as possible, Ms. Holtorf also provided copies of orders for all of E.M.'s possible treatments. Later that afternoon, E.M.'s mother gave Mr. Patche the diabetic plan and answers to all his questions as well as the additional documents supplied by Ms. Holtorf.

28.   That evening Mr. Patche called to say that E.M. could not attend camp the following day since the Wellesley Health Department and his medical consultant had not yet gotten

back to him about the documents supplied by E.M.'s heath care provider. He stated that

he hoped E.M. could return to camp on Wednesday afternoon.

29.    On or about Wednesday, June 30, E.M.'s father spoke to Lenny Izzo, an employee of the

Wellesley Health Department. Mr. Izzo stated that the camp should have flagged this

matter as soon as they received E.M.'s medical records and obtained all necessary

information before the start of camp. He promised to make inquiries into the situation.

Later that day E.M.'s mother spoke with a nurse named Holly from the Wellesley Health

Department who stated that they would review the diabetic plan of care once they

received it. That afternoon, when E.M.'s father picked up H.M. at the camp, he asked

Mr. Patche about the status of the matter. Mr. Patche stated that everything was in the

hands of their legal department and that he would let the family know their decision as

soon as possible.

30.    On or about June 30 or July 1, Ms. Berry, the counselor who had volunteered to care for

E.M., attended a meeting at the camp with representatives of the Wellesley Health

Department and camp management. The Health Department employees quizzed her on

her knowledge of E.M.'s care and were satisfied with her answers. Ms. Berry stated that

she was comfortable in caring for E.M.. At the same meeting, Peter Sylvester, the Camp

director, told Ms. Berry that, even though she was willing to provide care, TSI would not

permit E.M. to come back.

31.    On or about Thursday, July 1, E.M.'s mother received a call from the Wellesley Health

Department telling her that the Board and the Camp physician had approved E.M.'s plan

of care.

32.  E.M.'s mother then called Mr. Patche and left a message asking whether the information she had received from the Health Department was correct.  Shortly thereafter, she received a call from Gary Kendig, the TSI district manager for the Boston region.  Mr. Kendig stated that the corporate managers in New York had decided that the camp could not accommodate E.M.  He stated that the Camp might be willing to accept E.M. if her parents provided a one-on-one counselor, a suggestion that her mother rejected.  She stated that she was withdrawing E.M.'s sister, H.M., from the camp and requested a refund of the tuition they had paid, to which Mr. Kendig agreed.

33.  The family then enrolled both children in Camp Joey, a camp run by the Wellesley Recreation Department, for the following week.  However, the camp had no vacancies for the rest of the summer.  Camp Joey staff monitored E.M.'s diabetes without difficulty during the week that she attended.

34.  As a result of defendants' actions, E.M. was deprived of an opportunity to attend camp because she has diabetes.  She was hurt and disappointed and felt stigmatized because of her diabetes for the first time in her life.  These feelings were exacerbated because E.M.'s older sister, who does not have diabetes, was permitted to attend the camp for several days while E.M. was left waiting while the Defendants delayed the decision about whether E.M. could rejoin the other campers after attending only the first day of camp.

## CLAIMS FOR RELIEF

36.  Plaintiff realleges all of the allegations of this complaint as though fully set forth herein.

37.  As described above, Defendants discriminated against E.M. in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of

their place of public accommodation on the basis of disability or because they regarded

E.M. as a person with a disability, in violation of 42 U.S.C. § 12182, and implementing

regulations at 28 C.F.R. § 36.201, by:

a)  denying E.M. the opportunity to participate in TSI's programs or activities

that are not separate or different from those programs or activities

available to persons without disabilities, in violation of

42 U.S.C. § 12182 (b)(1)(C), and implementing regulations at

28 C.F.R. § 36.301; and

b)  failing to make reasonable modifications in policies, practices, and

procedures when such modifications are necessary to afford Defendants'

goods, services, facilities, privileges, advantages or accommodations to

E.M. or other persons with disabilities, in violation of

42 U.S.C. § 12182(b)(2)(A)(ii); and implementing regulations at 28

C.F.R. § 36.302.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court:

a.  Declare that the discriminatory practices, polices, and procedures of the Defendants, as

set forth above, violate title III of the Americans with Disabilities Act, 42 U.S.C.

§§ 12181-12189, and the Department of Justice's implementing regulations at 28 C.F.R.

Part 36;

b.  Enjoin the Defendants, their officers, agents, and employees, and all other persons in

active concert or participation with any of them, from discriminating on the basis of any

11

disability, including, but not limited to, insulin-dependent diabetes;

c.    Order the Defendants to develop and implement a plan to provide appropriate services to

individuals with disabilities, including, but not limited, to persons with insulin-dependent

diabetes, when necessary to enable them to participate in Defendants' programs and

services;

d.    Order the Defendants to design and implement appropriate staff training programs to

ensure that all staff who have contact with program participants are knowledgeable about

policies related to provisions of services to persons with insulin-dependent diabetes;

e.    Award monetary damages to compensate E.M. and her family for the injuries resulting

from such discrimination pursuant to 42 U.S.C. § 12188(b)(2)(B) and 28 C.F.R. § 36.504;

f.    Assess a civil penalty against the Defendants in an amount authorized by 42 U.S.C.

§ 12188(b)(2)(C), and its implementing regulation at 28 C.F.R. § 36.504; and

g.    Order such other appropriate relief as the interests of justice may require.

## <u>Jury Demand</u>

Plaintiff-Intervenor hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

ALBERTO R. GONZALES
Attorney General of the United States

_____
WAN J. KIM
Assistant Attorney General
Civil Rights Division

MICHAEL J. SULLIVAN
United States Attorney
Eastern District of Massachusetts

Date: March  15 , 2006

_____
BARBARA HEALY SMITH
Assistant United States Attorney
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3263
barbara.h.smith@usdoj.gov

_____
JOHN L. WODATCH, Chief
PHILIP L. BREEN, Special Legal Counsel
RENEE M. WOHLENHAUS, Deputy Chief
Disability Rights Section
Civil Rights Division

_____
ROBERT J. MATHER
Senior Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice - NY/A
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(202) 307-2236
robert.mather@usdoj.gov

13